UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

CHARLES MOORE,

        Plaintiff,

v.

WILLIE O. SMITH et al.,

        Defendants.
_____/

Case No. 1:13-cv-881

Honorable Gordon J. Quist

**OPINION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's due process claim for failure to state a claim upon which relief can be granted. The Court will serve the complaint with the two remaining claims against all Defendants.

**Discussion**

I.      Factual allegations

Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility. However, the events about which Plaintiff complains took place while he was housed at the Carson City Correctional Facility (DRF). Plaintiff sues the following DRF personnel: Warden Willie O. Smith; Deputy Wardens Tony Treiweiler, Timothy Kipp and Laura Krick; Assistant Resident Unit Supervisors (ARUSs) Russell Klatt and Brad Showers; Resident Unit Manager (RUM) Cheryl Miller; Inspectors (Unknown) Christiansen and (Unknown) Sanchez; Corrections Officers (Unknown) Clark, (Unknown) Hynesbach and (Unknown) Stott.

According to Plaintiff's amended complaint, on October 10, 2012, he was housed in the A-wing of the 800-unit at DRF. In March, 2011, prior to Plaintiff's arrival, the 800-unit prisoners' representative[1] submitted the "800 Unit Agenda" seeking clarification regarding the "unit policy on diluting bleach and laundry soap?" (Am. Compl., Docket #7-1, Page ID#58.) DRF staff responded that there was no need to dilute bleach or other cleaners as special dispensers dilute those products as needed. (*Id*.)

Shortly thereafter, but still prior to Plaintiff's arrival at the 800-unit, on April 21, 2011, at the Warden's Forum,[2] the prisoner representative informed Defendant Smith that staff were diluting bleach. Defendant Smith directed Defendant Treiweiler to investigate whether bleach was being diluted prior to dispensing. (*Id.* at Page ID#61.)

---

[1] The prisoner housing unit representative "assist[s] housing unit staff in identifying and resolving problems which exist in the unit." MDOC Policy Directive 04.01.150(B).

[2] The Warden's Forum is "comprised of the institution's housing unit representatives" who "meet with the Warden at least monthly to discuss matters of concern to the general prisoner population." MDOC Policy Directive 04.01.150(L), (N).

On January 22, 2012, subsequent to his arrival at the 800-unit, Plaintiff wrote to Defendant Smith alerting him to the potential health hazards caused by diluting the bleach used to wash inmates' laundry. Plaintiff closed his letter by appealing to Defendant Smith "to stop the splitting of bleach in 800 unit before someone unnecessarily contracts disease." (Am. Compl., Ex. 1, Docket #7-1, Page ID#52.) In addition, sometime prior to February 10, 2012, Plaintiff asked Defendants Clark and Hynesbach to instruct the unit-porters to cease diluting the bleach and disinfectants used to clean the unit and to ensure that the bathrooms and showers were properly cleaned because mold was present throughout the unit. Plaintiff alleges that Defendants Smith, Clark and Hynesbach failed to do anything in response to his complaints.

On February 10, 2012, Plaintiff filed a grievance against Defendants Smith, Treiweiler and Clark "after he directly observed Clark diluting the bleach used for prisoners' laundry and containers used to clean bathrooms and living areas." (Am. Compl., Docket #7-1, Page ID#42.) In his grievance, Plaintiff pointed out that he had already written to Defendant Smith and he complained about retaliatory threats and conduct by DRF staff. Plaintiff does not describe the nature of the retaliatory threats or conduct.

Defendant Showers responded to Plaintiff's Step I grievance and Defendant Miller reviewed the Step I response. The Step I investigation revealed that "at times some prisoner laundry men were diluting the bleach when the inventory was very low. The rationale was that some bleach was better than none." (Am Compl., Docket #7-1, Page ID#55.) In an effort to resolve the grievance, "[s]taff and prisoners were instructed to use the bleach and any other cleaning materials in the medium and manner in which it was intended and delivered." (*Id.*) Plaintiff appealed the Step I response to his grievance because it failed to address the unsanitary conditions in the showers and toilet areas of the unit and it failed to address Plaintiff's complaints of retaliation by staff.

3

Defendant Krick, the Step II respondent, concurred with the Step I response and explained that further investigation did not show a lack of sanitary conditions in the unit. (*Id.* at Page ID#57.) Plaintiff appealed again. The Step III respondent upheld the Step I and II responses.

On April 4, 2012, Plaintiff filed a new grievance detailing an incident between Plaintiff and Defendant Klatt in which Plaintiff asked Klatt whether a prison staff member named in a grievance could review and investigate that grievance. Defendant Klatt told Plaintiff this was allowed and asked Plaintiff what the grievance was about. Plaintiff explained that the grievance was about the dilution of bleach. Plaintiff complained that Defendant Showers, who reviewed the grievance, was one of the people responsible for diluting the bleach. Defendant Klatt told Plaintiff that if he has a problem with the way bleach was dispensed in the unit, maybe he should be moved to another unit. Plaintiff told Klatt that such a move would be considered retaliation. Defendant Klatt then stated that he would move Plaintiff to unit 1200 which is at a higher security level then the 800-unit. Plaintiff considered Defendant Klatt's threat to move him and increase his security level a deliberate attempt to scare Plaintiff from using the grievance process. (*Id.* at Page ID#68.) The Step I response denied Plaintiff's grievance. The Step I investigation revealed that Defendant Klatt remembered telling Plaintiff he could go back to the 1200-unit because that unit did not dilute bleach. Defendant Klatt denied threatening to move Plaintiff to the 1200-unit. (*Id.* at Page ID#69.) Defendant Miller, the Step I respondent, concluded her response by noting that the 800-unit does not dilute its bleach, the bleach is diluted automatically by a "dial -a-mix system" and that this is not a threat to a prisoner's health or safety. (*Id.* at Page ID#69.)

Plaintiff filed a Step II appeal expressing disagreement with Defendant Miller's conclusions and indicating that mold in several cells posed an unsafe condition. (*Id.* at Page ID#70.) Defendant Smith responded to the Step II appeal denying that Defendant Klatt had engaged in

4

threatening conduct and finding that issues concerning cleanliness had been addressed in accordance with MDOC Policy Directive (PD) 04.03.102 which requires Wardens to develop and maintain a housekeeping plan. (*Id.* at Page ID# 71.) Plaintiff pursued a Step II appeal. The grievance manager responded and upheld Step I and Step II responses.

At the April 16, 2012 Warden's Forum those present discussed concerns regarding mildew caused by roof leaks in some cells in the 800-unit. Defendant Krick agreed to look into the issue. After the meeting, Defendant Krick learned from Defendant Miller that maintenance was aware of the situation and would be contacted for follow up and resolution. (*Id.* at Page ID#66.)

After being elected as a prisoner representative, on July 29, 2012, Plaintiff wrote to Defendant Smith informing him that prisoners with confirmed cases of MRSA[3] were allowed to remain housed in the 800-unit, and that Defendants Clark and Hynesbach refused to provide the porters with bleach to clean the areas used by prisoners with MRSA because Defendant Klatt had told them to save money. Plaintiff reminded Defendant Smith that he had personally spoken to Defendant Smith complaining about mold, the lack of disinfectants to clean and the dilution of laundry bleach. Plaintiff also reminded Defendant Smith that the last time Plaintiff had a face-to-face meeting with Defendant Smith, Defendant Smith stated that he had authorized staff to save money. (*Id.* at Page ID#72.)

On August 12, 2012, Plaintiff again wrote to Defendant Smith. This time Plaintiff's letter concerned retaliatory conduct by Defendants Klatt, Showers, Clark, Hynesbach, Stott and Miller. Plaintiff's letter was intended to follow up on an in-person conversation that Plaintiff had with Defendant Smith. Plaintiff wrote that after speaking with Defendant Smith about his concerns

---

[3]MRSA stands for methicillin-resistant taphylococcus aureus infection. MRSA "is caused by a strain of staph bacteria that has become resistant to the antibiotics commonly used to treat ordinary staph infections," http://www.mayoclinic.org/mrsa/ (last visited November 14, 2013).

5

regarding the "hazardous living conditions" present in the 800-unit, Defendant Smith got upset and used profanity and stated that Plaintiff was a "pain in the ass." (*Id.* at Page ID#73.)

At the August 21, 2012, Warden's Forum, Plaintiff complained about hazardous living conditions, poor ventilation and the excessive mark-up of certain items available for purchase. Defendant Smith got angry, used profanity and threatened the group with "punitive segregation." (*Id.* at Page ID#45.) Plaintiff alleges that since this event, he has been subjected to retaliation,[4] but he does not describe any retaliatory events.

In September, 2012, Plaintiff alleges that Defendant Kipp offered to create a job for Plaintiff at the highest pay-rate if Plaintiff would quit the Warden's Forum and stop filing grievances against Defendant Smith and others. Plaintiff told Defendant Kipp that he was trying to bribe Plaintiff. Defendant Kipp threatened Plaintiff that he would "be sorry" if he didn't stop complaining about hazardous living conditions. (*Id.* at Page ID#46.) Plaintiff wrote to Defendant Kipp memorializing their in-person meeting and requesting a transfer to the Macomb facility.

Plaintiff alleges that soon after the meeting with Defendant Kipp his trust account was blocked and no transactions could take place. Plaintiff did not receive a "notice of intent' before his trust account was blocked.[5] Plaintiff met with Defendant Christiansen to discuss his trust account but Defendant Christiansen told Plaintiff that he did not block Plaintiff's account. Plaintiff then discussed this issue with Defendant Klatt who showed him that the account reflected that it was

---

[4] Although not detailed in the text of his complaint, in a December 9, 2012 grievance written after he was transferred to MCF, Plaintiff described multiple incidents of alleged retaliation. *See* Am. Compl., Docket #7-1, Page ID##80-83.) For example, Plaintiff alleges that in May, 2012, he was confronted and verbally harassed by Defendants Klatt, Hynesbach and Stott after Plaintiff, who was voted the 800-unit prisoner representative, visited Defendant Kipp on several occasions to discuss unit issues. (*Id.* at Page ID#81.) In August, 2012, Defendant Stott falsely accused Plaintiff of wrongdoing. Not having done that which he was accused of, Plaintiff felt threatened by Defendant Stott's behavior.

[5] MDOC Policy Directive 04.02.105(J) states that "[n]otice of the block [of the prisoner trust account] shall be provided to the sender or prisoner, as appropriate, within a reasonable time after the block is initiated."

6

"frozen by the Inspector." (*Id.*) Plaintiff then went to see Defendant Sanchez, who by that time had become the DRF Inspector. Defendant Sanchez stated that he knew who Plaintiff was and what he had been doing, and suggested that Plaintiff stop filing grievances.

On December 5, 2012, Plaintiff was transferred out of DRF. He alleges that this transfer was retaliatory.

Plaintiff alleges claims for retaliation in violation of the First Amendment, due process violations in connection with his blocked trust account and Eighth Amendment violations in connection with hazardous living conditions. As relief, Plaintiff seeks a declaratory judgment and compensatory and punitive damages.

II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Retaliation

The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v.*

*Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). At this initial screening stage, Plaintiff has sufficiently stated a claim for retaliation under the First Amendment.

      B.     Due Process

Plaintiff alleges that his due process rights were violated when Defendants temporarily blocked his prison trust account.[6] There does not appear to be any clear authority in the Sixth Circuit or any other Circuit Court on whether something other than a permanent deprivation of inmate funds could qualify as an interference with a property interest requiring due process protections. *See Watkins v. Buss,* No. C10-1351-JCC, 2011 WL 2600479, at *10 (W.D. Wash. May 12, 2011) (noting that "there does not appear to be any clear Ninth Circuit law on whether something other than a permanent deprivation of inmate funds could qualify as an interference with a property interest requiring due process protections"); *Clark v. Wilson*, 625 F.3d 686, 691 (10th Cir. 2010) (noting that "we have never before addressed the question of whether freezing a prison account in response to a garnishment summons imposes an atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life"). *But see Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 291 (3d Cir. 2008) (finding a deprivation of a protected property interest for purposes of procedural due process where prison officials assessed a prisoner's inmate account for medical and other expenses, without actually deducting funds from the account).

Nevertheless, assuming arguendo a temporary freeze qualifies for due process protection, Plaintiff still cannot state a claim because such a claim would be barred by the doctrine

---

[6] The block on Plaintiff's prison trust account was lifted when he was transferred to MCF. Based on Plaintiff's allegations it appears that his trust account was frozen, at most, between October, 2012 and early December, 2012. (*See* Am. Compl., Docket #7-1, Page ID#82 ("In October of 2012, [Plaintiff] was informed by [his] family that [his trust] account was "blocked" preventing them from sending [him] funds"); Page ID#83 ("upon arriving at MCF the block mysteriously disappeared").)

of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized negligent or intentional acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, the Sixth Circuit has held that Michigan law provides "several adequate post-deprivation remedies" to a prisoner asserting improper removal and deprivation of property. *Copeland*, 57 F.3d at 480. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Jul. 9, 2012). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; Policy Directive, 04.07.112, ¶ B. Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See*

10

*Copeland*, 57 F.3d at 480. Plaintiff has made no allegations to the contrary. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property.

The Court also notes that Defendants' alleged failure to abide by prison policy does not itself give rise to a constitutional claim. *See Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). For the foregoing reasons, therefore, Plaintiff does not state a due process claim with respect to the freezing of his prison account.

### C. Eighth Amendment

Poor ventilation leading to prolonged exposure to foul odors or unhealthy airborne microorganisms can violate the Eighth Amendment in some circumstances. *See Board v. Farnham*, 394 F.3d 469, 485–86 (7th Cir. 2005) (flow of black fiberglass dust into cells causing numerous nosebleeds and respiratory problems violated Eighth Amendment); *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) ("Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary. . . . If the air was in fact saturated with the fumes of feces, urine, and vomit, it could undermine health and sanitation.") (internal quotations and citations omitted). Likewise, exposure to serious communicable diseases, including MRSA, may form the basis of a deliberate indifference claim under the Eighth Amendment where there is an "unacceptable risk of serious damage to [Plaintiff's] future health." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (environmental smoke); *Wooler v. Hickman Cnty.,*

*Kentucky*, No. 5:05CV-247-R, 2008 WL 5412826, at *7 (W.D. Ky. Dec. 30, 2008) ("various federal courts have recognized that 'the risk of contracting MRSA has been specifically identified . . . as the type of condition which may form the basis of a medical indifference claim'"); *Kimble v. Tennis*, No. 4:CV-05-1871, 2006 WL 1548950 (M.D. Pa. June 5, 2006) (placement of inmate who had MRSA into the general population stated an Eighth Amendment claim). At this initial screening stage, Plaintiff has sufficiently stated an Eighth Amendment claim.

### **Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Plaintiff claim for due process violations will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the remaining two claims in the complaint against all Defendants.

An Order consistent with this Opinion will be entered.


Dated: November 27, 2013                     /s/ Gordon J. Quist
                                          GORDON J. QUIST
                                     UNITED STATES DISTRICT JUDGE