UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES MOORE,

                Plaintiff,

v.

WILLIE O. SMITH, *et al.*,

                Defendants.

_____/

Case No. 1:13-cv-881

Hon. Gordon J. Quist

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983.  This matter is now before the Court on a motion for summary judgment filed by defendants Smith, Treiweiler, Kipp, Krick, Klatt, Showers, Miller, Christiansen, Sanchez, Hynesbach, Clark and Stott (docket no. 82).[1]

### I.      Plaintiff's amended complaint

The events about which plaintiff complains took place while he was housed at the Carson City Correctional Facility (DRF).  Plaintiff sues the following DRF personnel:  Warden Willie O. Smith; Deputy Warden Tony Treiweiler; Deputy Warden Timothy Kipp; Deputy Warden Laura Krick; Assistant Resident Unit Supervisor (ARUS) Russell Klatt; ARUS Brad Showers; Resident Unit Manager (RUM) Cheryl Miller; Inspector Christiansen; Inspector Sanchez; Corrections Officer (CO) Clark, CO Hynesbach and CO Stott.

---

[1] The Court previously denied plaintiff's motion for default judgment against defendant Clark.  *See* Order (docket no. 67).  However, it appears that counsel now represents defendant Clark, having filed a motion for summary judgment on her behalf.  *See* Defendants' Motion at PageID.285.

Plaintiff was housed at DRF on November 23, 2011.  Letter (docket no. 7-1, PageID.51).  On January 22, 2012, plaintiff wrote a letter to Warden Smith complaining about the "serious risks to his health and safety" as a result of COs Clark and Hynesbach's decision to dilute bleach and that he had complained about it to ARUS Showers.  Amend. Compl. (docket no. 7, PageID.43).  Sometime prior to February 10, 2012, plaintiff asked COs Clark and Hynesbach "to instruct the unit ports to quit diluting the bleach and disinfectants and to ensure the bathrooms, sinks and showers are properly cleaned since mold was present all over the unit," knowing that there were cases of prisoners infect with Methicillin-resistant Staphylococcus aureus (MRSA).  *Id*. at PageID.42.  Plaintiff filed a grievance on February 10, 2012 against Warden Smith, Deputy Warden Treiweiler and CO Clark after he saw Clark "diluting the bleach used for prisoners' laundry, and containers used to clean showers, toilets and living areas."  *Id*.  In this regard, plaintiff alleged that according to MDOC records, Deputy Warden Treiweiler was aware of a bleach dilution problem as early as March 2011.  *Id*. at PageID.43.

On April 4, 2012, plaintiff filed a grievance against Warden Smith for failing to investigate ARUS Klatt's retaliatory conduct.  *Id*. at PageID.44.  Plaintiff does not allege the nature of Klatt's retaliatory conduct, other than Klatt's statement "that if the Plaintiff had a problem with the way bleach was handled: 'maybe I should move you to  .  .  .  unit 1200,' which is  a higher security level."  *Id*.

During the Warden's Forum on April 16, 2012, prisoners brought up their concerns about mildew and roof leaks to Warden Smith and Deputy Wardens Treiweiler and Krick.  *Id*. at PageID.43.

In July and August 2012, after plaintiff was elected as a "Prisoner's Representative," he wrote letters to the Warden complaining about various matters related to the diluted bleach, cases of MRSA, "mold all over" the shower walls and lack of disinfectants. *Id*. at PageID.44-45. Plaintiff also wrote letters complaining of retaliatory conduct by ARUS Klatt, ARUS Showers, CO Clark, CO Hynesbach, CO Stott and RUM Miller. *Id*. at PageID.45.

At the Warden's Forum on August 21, 2012, prisoners' representatives "brought up the hazardous living conditions and poor ventilation to Defendants Smith, Kipp and Krick's attention." *Id*. The prisoners' complaints "angered" Warden Smith who threatened all of the representatives with punitive segregation. *Id*. Since that date, plaintiff has been subject to retaliation. *Id*.

The sanitation issue was raised at a Warden's Forum meeting in September 2012, at which Warden Smith, Deputy Warden Kipp and Deputy Warden Krick were present. *Id*. Warden Smith again used abusive language in addressing the prisoners. *Id*.

In September 2012, Deputy Warden Kipp called out plaintiff and offered him a job if plaintiff would quit the Warden's Forum and stop filing grievances against the Warden and other staff. *Id*. at PageID.45. According to plaintiff, Deputy Warden Kipp "threatened that if Mr. Moore continued bringing up prisoners' complaints and protesting about the hazardous conditions, he will be sorry." *Id*. at PageID.45-46. Plaintiff asked Deputy Warden Kipp to transfer him to the Macomb Facility. *Id*. at PageID.46.

3

Sometime after his meeting with Deputy Warden Kipp, both plaintiff's Prisoner Trust Account and his "J-Pay" account were frozen.[2]  *Id*.  While being interviewed by Inspector Christiansen, the inspector denied freezing plaintiff's account.  *Id*.  ARUS Klatt showed plaintiff a computer screen that said "Account frozen by the Inspector."  *Id*.  Inspector Sanchez became the new inspector, and  told plaintiff "I am aware who you are and what you have been doing.  Maybe you shouldn't be filing grievances."  *Id*.  Finally, plaintiff alleged that his transfer out of DRF on December 5, 2012 was "in retaliation in violation of MDOC's Policies and Operating Procedures." *Id*.

Plaintiff's amended complaint set forth three counts against defendants.  In Count I, plaintiff alleged that defendants retaliated against him.  *Id*. at PageID.46-47.  In Count II, plaintiff alleged that defendants violated his due process rights by freezing his account.  *Id*. at PageID.47-48. In Count III, plaintiff alleged that defendants acted with deliberate indifference by willfully exposing him to MRSA, mold, unsanitary conditions and lack of ventilation.  *Id*. at PageID.48-49.  Plaintiff seeks $150,000.00 of damages from each defendant.  *Id*. at PageID.50.

In screening the amended complaint, the Court found that plaintiff had sufficiently alleged a claim for retaliation under the First Amendment.  *Id.* at PageID.93-94.  The Court also found that plaintiff had alleged Eighth Amendment claims related to poor ventilation ("[p]oor ventilation leading to prolonged exposure to foul odors or unhealthy airborne microorganisms can violate the Eighth Amendment in some circumstances") and exposure to communicable diseases ("[l]ikewise, exposure to serious communicable diseases, including MRSA, may form the basis of

---

[2] "JPay is a provider of money transfer services for individuals in correctional facilities and their family and friends." *JPay, Inc. v. Kobel*, No. 16-20121, 2016 WL 2853537 at *1 (S.D. Fla. May 16, 2016).

a deliberate indifference claim under the Eighth Amendment where there is an 'unacceptable risk of serious damage to [Plaintiff's] future health.'"). *Id.* at PageID.96-97. However, the Court rejected plaintiff's due process claim with respect to freezing his prison account. *Id.* at PageID.94-96. The Court dismissed plaintiff's due process claims and authorized service with respect to his First Amendment and Eighth Amendment claims. *Id.* at PageID.97; Order for partial dismissal and partial service (docket no. 9).

## II.   Defendants' motion for summary judgment

### A.   Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

## B.    RUM Miller

Plaintiff testified that RUM Miller is a defendant only because she responded to his grievances. Charles Moore Dep. (docket no. 83-2, PageID.337). A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). Accordingly, RUM Miller is entitled to summary judgment on all claims.

## C.    Eighth Amendment claim that Warden Smith, Deputy Warden Treiweiler, Deputy Warden Krick, ARUS Showers, CO Clark and CO Hynesbach exposed plaintiff to an unreasonable risk to his future health by diluting the bleach used

**to sanitize laundry and exposing him to infectious
diseases**

Plaintiff alleged that defendants violated his Eighth Amendment rights by diluting

the bleach used for laundry and cleaning.   The only time that plaintiff actually observed this

occurrence was on an unspecified date when he stood outside of the laundry room and observed

another prisoner diluting the bleach into a mechanical device used to dispense the bleach into the

laundry.  Moore Dep. at PageID.319.  According to plaintiff, this resulted in "double diluting" the

bleach because the system "is designed to dilute pure bleach to the right amount [sic] water going

into the washing machine"  and "taking away from its effectiveness."  *Id*. at PageID.321.   Plaintiff

also stated that the washing machines were being used to launder prisoners' clothes as well as

mopheads used to clean hazmat spills.  *Id*.

Inmates have a constitutionally protected right to health and safety grounded in the

Eighth Amendment.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  Thus, prison staff are obliged

"to take reasonable measures to guarantee the safety of the inmates" in their care.  *Hudson v. Palmer*,

468 U.S. 517, 526-27 (1984).  In order for a prisoner to prevail on an Eighth Amendment claim, he

must show that he faced a sufficiently serious risk to his health or safety and that the defendant

official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d

474, 479-80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834 (applying deliberate indifference

standard to medical claims)).  As the Supreme Court explained:

> [W]hen the State takes a person into its custody and holds him there against his will,
> the Constitution imposes upon it a corresponding duty to assume some responsibility
> for his safety and general well being.  .  .  .   The rationale for this principle is simple
> enough: when the State by the affirmative exercise of its power so restrains an
> individual's liberty that it renders him unable to care for himself, and at the same time
> fails to provide for his basic human needs - e.g., food, clothing, shelter, medical care,

7

and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment.  .  .  .

*Helling v. McKinney*, 509 U.S. 25, 32 (1993).

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). "The contemporary standards of civilized decency that currently prevail in society determine whether conditions of confinement are cruel and unusual." *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004), citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834.  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson*, 503 U.S. at 8.

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9.  To establish the objective component, extreme deprivations are required and only deprivations denying "the minimal civilized measure of life's necessities" are grave enough to create a violation of the Cruel and Unusual Punishment Clause. *Hadix*, 367 F.3d at 525, citing *Hudson*, 503 U.S. at 9, and quoting *Rhodes*, 452 U.S. at 347.  A claim for exposure to an unreasonable risk to future health, as brought by plaintiff in this case, may be brought before the prisoner suffers a health problem.

That the Eighth Amendment protects against future harm to inmates is not a novel proposition.  The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is reasonable safety.  It is cruel and unusual punishment to hold convicted criminals in unsafe conditions.  It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened

to them.  The Courts of Appeals have plainly recognized that a remedy for unsafe
conditions need not await a tragic event.

*Helling*, 509 U.S. at 33 (internal citations and quotation marks omitted).

To establish the objective component in this case, plaintiff must show that he himself
is being exposed to the unsafe condition.  *Id*. at 35.  Determining whether plaintiff's conditions of
confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into
the seriousness of the potential harm and the likelihood that such injury to health will actually be
caused by exposure to the unsanitary condition.  *Id*. at 36.  "It also requires a court to assess whether
society considers the risk that the prisoner complains of to be so grave that it violates contemporary
standards of decency to expose anyone unwillingly to such a risk."  *Id*.  "In other words, the prisoner
must show that the risk of which he complains is not one that today's society chooses to tolerate."
*Id*.

The subjective component requires that the defendant act with deliberate indifference
to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the
subjective component, the plaintiff must show that "the official knows of and disregards an excessive
risk to inmate health or safety; the official must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."
*Farmer*, 511 U.S. at 837.  "It is obduracy and wantonness, not inadvertence or error in good faith,
that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley
v. Albers*, 475 U.S. 312, 319 (1986).  With respect to a claim involving the risk of future harm,
deliberate indifference "should be determined in light of the prison authorities' current attitudes and
conduct."  *Helling*, 509 U.S. at 36.  For example, in *Helling*, a case involving environmental tobacco

9

smoke (ETS), the Supreme Court found that depending on how a new smoking policy was administered, "it could be very difficult to demonstrate that prison authorities are ignoring the possible dangers posed by exposure to ETS." *Id*. at 36-37.

The gravamen of plaintiff's claim is that Warden Smith, Deputy Warden Treiweiler, Deputy Warden Krick, CO Clark and CO Hynesbach exposed him to an unreasonable risk to his future health by diluting the bleach, because some prisoners in the unit were infected with MRSA. Here, plaintiff testified that he complained about the bleach situation to CO Clark and CO Hynesbach. Moore Dep. at PageID.320. Their response was "like, no big deal" and "they went about their business." *Id*. Plaintiff then filed a grievance against CO Clark, Deputy Warden Treiweiler, and Warden Smith on February 13, 2012. *Id*.; Grievance DRF-12-02-0394-03D ("394") (docket no. 83-3). The grievance indicated that the incident occurred on February 10, 2012, stating in pertinent part that:

> This grievance is filed against DRF's Warden Willie Smith, Deputy Warden Treiweiler, ADW Fuqua, and RUO Clark. The basis of my grievance is the unsafe and hazardous risks to my health and safety posed by the transference of disease because bleach has been diluted. On February 10, 2012, I personally watched RUO Clark diluting the amount of bleach inside the containers, and observed the diluted bleach container hooked up to the unit-washer. There has been several prisoners infected with "MARSA" [sic] because: (a) poor sanization [sic], (b) disinfectants are diluted, and (c) showers and toilet areas are filled with bacteria posing hazardous conditions. I had written a letter to the Warden and those named in this grievance and all I received is retaliatory threats.

Grievance 394 at PageID.350.

The letter to the Warden referenced in the grievance was dated January 22, 2012. *See* Warden's Letter (docket no. 83-3, PageID.352-353). In this letter, plaintiff stated that he is "a

10

certified Appliance Repair Tech trained in repairing washers, dryers, refrigerators and stoves." *Id.*

at PageID.352. Plaintiff further stated (in his words):

> Having that knowledge gives me a true understanding of how these industrial washers are calibrated to run a certain way.  In the case of these particular washers, the intake mechanism is designed to add the proper amount of "<u>PURE</u>" bleach to each load.  Pre-diluting the pure bleach containers means that the washers computer is being tricked into thinking that its putting the proper amount of bleach into each load when in fact it is not.
>
> This practice is dangerous to myself, other prisoners and the in unit staff because it increases the risk of disease being spread.  As I am sure you are aware that all prisoners use the laundry room and some of them may have infectious diseases that are transmissible in nature.  Pre cutting the bleach means we lose an important allie in the prevention of the mass spreading of these contaigns.  It is important to note that this wash is also used to clean mopheads and scrap rags that could also carry infection.

*Id.* at PageID.352-353.

After investigating plaintiff's claim, ARUS Showers (respondent) and RUM Miller

(reviewer) addressed the grievance.  *Id.* at PageID.354.  In the Step I response, they identified

plaintiff's complaint as "staff was instructing prisoner to dilute the bleach that is used in the laundry

room."  Grievance 394 at PageID.354.  Upon investigation,

> It was found that at some times prisoner laundry men were diluting the bleach when the inventory was very low.  The rationale was that some bleach was better than none.

*Id.*  The response referenced the MDOC Policy Directive regarding Humane Treatment and Living

Conditions for Prisoners, PD 03.03.130, and the correctional facility's policy for laundry, i.e., "DRF

OP 04.07.110 a Laundering of Prisoner Clothing and Linens."  *Id.*  To resolve the grievance, "Staff

and Prisoners were instructed to use the bleach and other cleaning materials in the medium and

manner in which it was intended and delivered."  *Id.*

11

Here, plaintiff testified that he had various pre-existing conditions (e.g., diabetes, hypertension and allergies); he did not identify any health problems associated with the bleach dilution. Charles Moore Dep. at PageID.344-345. Defendants contend that plaintiff failed to meet the objective prong because there is no evidence that either plaintiff or any other prisoner suffered a health problem due to the bleach dilution. Defendants' Brief (docket no. 83, PageID.298). Defendants' contention misconstrues the nature of plaintiff's claim against them. As the Supreme Court pointed out, "a remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33. Nevertheless, plaintiff's claim fails because there is no evidence that he faced an actual health risk, e.g., that the alleged "double diluted" bleach was of insufficient concentration to disinfect laundry. While plaintiff stated that he was a certified Appliance Tech, he is not an expert on preventing a communicable disease such as MRSA, and there is no evidence in the record to explain his "diluted bleach" theory, e.g., the chemical composition of "pure bleach" or "double diluted bleach" referred to by plaintiff, or the concentration of bleach necessary to disinfect laundry. Plaintiff has not demonstrated that he suffered from an actual health risk, let alone a health risk that today's society chooses not to tolerate. *See, Helling*, 509 U.S. at 36.

In addition, plaintiff has not demonstrated the subjective component of his Eighth Amendment claim. At his deposition, plaintiff clarified that his claim was not that defendants failed to do anything to address his concerns about using diluted bleach as a disinfectant, only that defendants' attempts "weren't enough." *Id.* at PageID.343. In plaintiff's words:

> . . . I am saying that they didn't do it in a timely manner. I am saying that it took them months, and months, and months of us being in the unit with prisoners with MRSA throughout the summer, before they actually acquiesced and started giving us a little bleach.

*Id.* at PageID.344.

In his response, plaintiff states that he first complained about the bleach dilution in January 2012, "[a]nd despite MRSA spreading all over the unit Defendants' did nothing until well after September 19, 2012." Plaintiff's Response Brief (docket no. 89, PageID.414). Assuming that this is true, plaintiff did not file a grievance regarding the dilution until February 13, 2012. As discussed, MDOC staff investigated the claim and addressed it in the March 23, 2012 grievance response. Plaintiff contends that the dilution of bleach continued after March 23, 2012, citing affidavits from prisoners Bennie Graves, Tavares Wesley, Ernest Kelly and Robert Pann. *Id.* at PageID.411, 414. However, none of these affidavits state that the dilution occurred after March 23, 2012. *See* Affidavits (docket nos. 89-3 and 89-11). In short, there is no evidence that the practice of which plaintiff complained extended past March 23, 2012. The record reflects that defendants did not ignore plaintiff's grievance regarding the bleach dilution. Rather, the grievance was investigated, the problem acknowledged, and DRF staff and prisoners were instructed to use the bleach and other cleaning materials as intended.[3] Accordingly, for the reasons discussed, Warden

---

[3] In reaching this determination, the Court declines to adopt defendants' position that their actions taken to remediate the diluted bleach problem, even if insufficient, did not violate the Eighth Amendment based on the reasoning in *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). *See* Defendants' Brief (docket no.83, PageID.299). This Court has cited *Westlake* for the proposition that in addressing Eighth Amendment claims involving alleged deliberate indifference to a serious medical condition, courts distinguish "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake*, 537 F.2d at 860 n. 5. *See Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) ("where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law") (citing *Westlake*, 537 F.2d at 860 n. 5). However, this Court has limited *Westlake* and *Graham* to claims involving medical judgment, typically in cases in which a prisoner disagrees with the course of medical treatment. Defendants have articulated no basis for applying *Westlake* and *Graham* to situations which do not involve the exercise of medical judgment.

Smith, Deputy Warden Treiweiler, Deputy Warden Krick, CO Clark and CO Hynesbach are entitled to summary judgment on plaintiff's Eighth Amendment claim.[4]

### D. Eighth Amendment claim against Warden Smith, Deputy Warden Krick, and Deputy Warden Kipp for Lack of ventilation

In his amended complaint, plaintiff alleged that defendants acted with deliberate indifference and willfully exposed him to: "(1) MRSA, (2) mold, (3) unsanitary conditions, and (4) lack of ventilation." Amend. Compl. at PageID.48-49. While plaintiff's claims for MRSA, mold and unsanitary conditions arose from the alleged bleach dilution, plaintiff's claim regarding the lack of ventilation arose from complaints made at the August 21, 2012 Warden's Forum. The Court specifically allowed plaintiff's amended complaint to proceed on his Eighth Amendment claim with respect to the lack of ventilation, stating in pertinent part:

> Poor ventilation leading to prolonged exposure to foul odors or unhealthy airborne microorganisms can violate the Eighth Amendment in some circumstances. *See Board v. Farnham*, 394 F.3d 469, 485–86 (7th Cir. 2005) (flow of black fiberglass dust into cells causing numerous nosebleeds and respiratory problems violated Eighth Amendment); *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) ("Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary. . . . If the air was in fact saturated with the fumes of feces, urine, and vomit, it could undermine health and sanitation.") (internal quotations and citations omitted).

Opinion (docket no. 8, PageID.96). Based on the undersigned's reading of the amended complaint, the lack of ventilation claims are directed at defendants Warden Smith, Deputy Warden Krick and Deputy Warden Kipp. *See* Amend. Compl. at PageID.45. However, defendants' motion for

---

[4] The Court notes that Deputy Warden Krick seeks summary judgment because her only involvement was a grievance reviewer. *See* Defendants' Reply Brief (docket no. 92, PageID.613). While she would not be liable as a grievance reviewer, *see Shehee*, 199 F.3d at 300, plaintiff also alleged that Krick attended the September 2012 Warden's Forum where the sanitation issue was discussed.

14

summary judgment does not address this claim.  Accordingly, plaintiff's claim regarding the lack of ventilation should proceed against these three defendants.

>       **E.      First Amendment retaliation claim against Deputy Warden Kipp, Inspector Christiansen, Inspector Sanchez, ARUS Klatt, ARUS Showers, CO Clark, CO Hynesbach, and CO Stott**

Plaintiff contends that defendants Inspector Christiansen, Inspector Sanchez, ARUS Klatt, ARUS Showers, RUM Miller, CO Clark, CO Hynesbach, and CO Stott retaliated against him for filing Grievance 394.  To prove a First Amendment retaliation claim, plaintiff must establish three elements:  "(1) the plaintiff engaged in protected conduct;  (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct."  *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations."  *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted).

>       **1.      Retaliatory transfer by Deputy Warden Kipp**

Plaintiff claims that his transfer to Muskegon Correctional Facility (MCF) was in retaliation for exercising his First Amendment rights.  "[G]enerally, a transfer to another institution

'does not constitute an adverse action since a transfer is merely an ordinary incident of prison life.'" *Jones v. Caruso*, 421 Fed. Appx. 550, 553 (6th Cir. 2011), quoting *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir.2005). Because prisoners are expected to endure more than the average citizen and enjoy no protected right to remain incarcerated in a given correctional facility, a transfer from one prison to another generally will not be considered sufficiently adverse to deter a prisoner of ordinary firmness from engaging in protected conduct. *See Hix. v. Tenn. Department of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006) (stating that "this Court has held that in the context of a First Amendment retaliation claim, a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility"). However, the Sixth Circuit has carved out a limited exception for cases in which foreseeable, negative consequences "inextricably follow" from the transfer. *See Siggers-El*, 412 F.3d at 702. In these exceptional cases, the question of whether a particular retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact. *See Jones*, 421 Fed. Appx. at 553 ("to survive summary judgment on his retaliation claim, Jones needed to make a sufficient showing of the foreseeable, negative consequences that inextricably followed from his transfer") (internal citations, quotation marks and brackets omitted).

Plaintiff has failed to demonstrate any such consequences. While plaintiff testified that Deputy Warden Kipp was "one of the people responsible" for his transfer and that it was "a collaborative effort," he does not elaborate on the others allegedly involved in his transfer. Moore Dep. at PageID.335-336. Plaintiff admits that he was one of several prisoners from DRF's 800 unit who were transferred to MCF when DRF's entire 900 unit was transferred. *Id.* at PageID.346. This mass transfer was addressed in defendants' response to plaintiff's Interrogatory No. 6, which asked

16

"Describe all the reasons and process for transferring Plaintiff and identify all individuals who

participated in the decision to transfer plaintiff." *See* Defendants' Answers to Interrogatories (docket

no. 83-4, PageID.363-364).  Defendants provided the following response:

> Two-hundred-forty prisoners had to transfer to Muskegon Correctional
> Facility to accommodate closure of one of the Level II housing units at Carson City
> Correctional Facility.  The plaintiff was transferred to assist in the facilitation of the
> closure of a Level II housing unit.

*Id.  See also,* Transfer Order (docket no. 83-5, PageID.369) (noting in comments "Transfer to MCF

to facilitate closure of DRF Level II Unit").

Plaintiff presents no evidence to support his claim for retaliatory transfer.  This is not

an exceptional case involving foreseeable, negative consequences that inextricably followed from

plaintiff's transfer.  "A transfer to the general population of another prison is not considered

sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment

rights." *Jewell v. Leroux*, 20 Fed. Appx. 375, 378 (6th Cir. 2001).  *See Ward v. Dyke*, 58 F.3d 271,

274-75 (6th Cir.1995) ("the ability to transfer prisoners is essential to prison management").

Accordingly, plaintiff's claim should be denied.

### 2. The temporary freeze of plaintiff's account by Inspectors Christiansen and Sanchez

Plaintiff testified that either Inspector Christiansen or Inspector Sanchez retaliated

against him by blocking his family's attempt to deposit money into plaintiff's prison "JPay"

Account.  Moore Dep. at PageID.341.  Plaintiff testified that this took place in November 2012 and

that the block was cleared off "immediately once I arrived at Muskegon Correctional."  *Id.*  Plaintiff

has provided no evidence to support this claim.  As an initial matter, plaintiff does not claim that

Inspector Christiansen took adverse action against him nor does he allege any facts to support such a claim.  In this regard, plaintiff alleged that:

> Soon after meeting with Defendant Kipp, [plaintiff's] "Prison Trust Account" was frozen as did [sic] his "J-Pay" account.  [Plaintiff] was interviewed by Defendant Christiansen and [plaintiff] asked him why his account was frozen.  Defendant Christiansen asserted he, as an Inspector, did not froze [sic] his account.

Amend. Compl. at PageID.46.

It appears that the basis for this retaliation claim is plaintiff's allegation that Inspector Sanchez explained to plaintiff that "it was the Inspector's office who frozen [sic] his account," that Sanchez told plaintiff that "I am aware of who you are and what you have been doing," and that "Maybe you shouldn't been [sic] filing grievances."  *Id*.  However, there is no evidence to support plaintiff's allegation regarding Sanchez.

Contrary to plaintiff's allegations, defendants have presented e-mails from JPay, Inc., which reflect that plaintiff's account was blocked by JPay, Inc. because of a fraud situation.  *See* JPay, Inc. e-mails (docket no. 83-6).  In an e-mail dated December 4, 2012 which referenced plaintiff, Jessica Lust, Project Manager at JPay, Inc., reported to Carol Wilson at the MDOC that:

> Our fraud department blocks customer and inmate accounts when we receive our credit card chargeback list.  If we receive a chargeback for a card, we are responsible for repayment of the funds.  We block the customer and prisoner from receiving future credit card transactions to minimize additional loses [sic].  This still allows the users to utilize one of our cash options, money orders or moneygrams.
>
> *                *                *
>
> I am having our fraud department look into the situation to determine if he needs to stay on JPay's restricted list.
>
> Once they finish their investigation, I will let you know.

JPay, Inc. e-mail (Dec. 4, 2012) at PageID.371.  Two days later, Ms. Lust reported to the MDOC that

the matter was resolved:

> After review, the prisoner was connected to a fraudulent customer but was not
> associated with the specific transaction.

> I requested that the block be lifted.

> His family can resume using credit cards.

Jpay, Inc. e-mail (Dec. 6, 2012).  The JPay, Inc. records demonstrate that plaintiff's account was

frozen by the third-party administering the account due to plaintiff's connection to a fraudulent

customer of JPay, Inc.  Accordingly, Inspectors Christiansen and Sanchez are entitled to summary

judgment on this retaliation claim.

> **3.  Comments and alleged threats by Warden Smith,
> ARUS Klatt, CO Clark, CO Hynesbach, and CO
> Stott**

> Plaintiff has not alleged any particular act of retaliation by these defendants.  In his

response to the motion for summary judgment, plaintiff states:

> Moore experienced retaliation as a result of of [sic] filing his grievance.
> Throughout Moore's stay in unit 800 he was threatened by Defendants' Willie O.
> Smith, C/O Clark, C/O Hynesbach, C/O Stott, and Russell Klatt.

Plaintiff's Response (docket no. 89, PageID.419-426).  Plaintiff's claims are without merit.  First,

plaintiff does not claim any adverse action other than the alleged retaliatory transfer.  As discussed,

the transfer was not an adverse action for purposes of a First Amendment retaliation claim.  Second,

plaintiff claims that these defendants made statements to him such as:  "I am tired of your grievances

and complaints.  Keep it up and I will ride your ass out of here" (Warden Smith); plaintiff was a "rat"

and a "problem" (CO Clark); "We might need to get rid of him" (CO Clark and ARUS Klatt);

plaintiff was "Kipp's rat" (CO Hynesbach); and "I don't like you Moore" (ARUS Klatt). *Id*. at

PageID.419-426.   The use of harassing or degrading language by a prison official, although

unprofessional and deplorable, does not rise to constitutional dimensions.  *See Ivey v. Wilson*, 832

F.2d 950, 954-55 (6th Cir. 1987). Accordingly, Warden Smith, ARUS Klatt, CO Hynesbach, CO

Stott and CO Clark should be granted summary judgment on plaintiff's retaliation claim.

### F.   Qualified Immunity

Finally, defendants contend that they are entitled to summary judgment on the

affirmative defense of qualified immunity.   Under this affirmative defense, "government officials

performing discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The

dispositive question is whether the violative nature of the particular conduct at issue in the lawsuit

is clearly established. *See Mullenix v. Luna*, -- U.S. --, 136 S. Ct. 305, 308 (2015). "A right is clearly

established only if its contours are sufficiently clear that a reasonable official would understand that

what he is doing violates that right."  *Carroll v. Carman*, -- U.S. --, 135 S. Ct. 348, 350 (2014).  "In

other words, existing precedent must have placed the statutory or constitutional question beyond

debate."  *Id.*  Thus, the doctrine of qualified immunity "gives government officials breathing room

to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those

who knowingly violate the law."  *Carroll*, 135 S. Ct. at 350.

When a defendant raises the issue of qualified immunity on summary judgment,

"[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to

qualified immunity."  *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).  Although the

plaintiff bears the ultimate burden, "[t]he defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.* Once this is accomplished, "the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id.* To meet his burden on summary judgment, a plaintiff must show (1) that a constitutional right was violated, and (2) that the right was clearly established at the time of the violation. *Chappell v. City Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). The court may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009).

Here, the defendants held a wide variety of positions at DRF as Warden, Deputy Warden, Inspector, ARUS, RUM and CO. While all of the defendants seek summary judgment on the basis of qualified immunity, the motion does not address any particular action undertaken by any particular defendant. Rather, they simply state that "the actions of the [sic] all of the Defendants are covered by qualified immunity." Defendants' Brief (docket no. 83, PageID.305-306). Defendants have failed to meet their "initial burden of coming forward with facts to suggest that he [or she] acted within the scope of his [or her] discretionary authority during the incident in question." *Gardenhire*, 205 F.3d at 311. Accordingly, defendants' claim of qualified immunity should be denied.

## IV. Recommendation

For these reasons, I respectfully recommend that defendants' motion for summary judgment (docket no. 82) be **GRANTED** with respect to all claims except for plaintiff's Eighth Amendment claim regarding lack of ventilation against defendants Smith, Krick and Kipp.

21

I further recommend that plaintiff's First Amendment claims and his Eighth Amendment claims arising from the alleged dilution of bleach asserted against defendants Smith, Krick and Kipp be **DISMISSED**.

I further recommend that defendants Treiweiler, Klatt, Showers, Miller, Christiansen, Sanchez, Clark, Hynesbach and Stott be **DISMISSED** from this action.

Dated:  March 3, 2017              /s/ Ray Kent                                
                                   RAY KENT
                                   United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).